FILED

April 14 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0267

DA 14-0267

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2015 MT 100

MARY MCCULLEY,

>Plaintiff, Appellee
>and Cross-Appellant,

v.

U.S. BANK OF MONTANA,

>Defendant, Appellant
>and Cross-Appellee.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DV 09-562C
Honorable John C. Brown, Presiding Judge

COUNSEL OF RECORD:

>For Appellant:

>>F. Matthew Ralph; Ben D. Kappelman, Dorsey & Whitney LLP,
Minneapolis, Minnesota

>For Appellee:

>>James A. Patten; Patricia D. Peterman, Patten, Peterman, Bekkedahl &
Green, PLLC, Billings, Montana

Submitted on Briefs:  February 25, 2015
Decided:  April 14, 2015

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 U.S. Bank of Montana (hereinafter U.S. Bank or the Bank) appeals from the judgment entered by the Eighteenth Judicial District Court, Gallatin County, following a jury trial. In 2006, Mary McCulley (McCulley) purchased a condominium in Bozeman and sought a 30-year residential financing loan from Heritage Bank, predecessor to U.S. Bank, in the amount of $300,000. In June 2009, McCulley brought action against U.S. Bank alleging the Bank defrauded her by issuing, without notice, an 18-month, $300,000 commercial loan, rather than the 30-year residential property loan for which she applied. Relying on erroneous sworn affidavits and documents submitted by U.S. Bank, the District Court dismissed McCulley's claims and entered summary judgment in favor of the Bank. Following McCulley's pro se appeal, this Court reversed and remanded for further proceedings regarding McCulley's allegations of fraud. *McCulley v. Am. Land Title* Co., 2013 MT 89, ¶ 36, 369 Mont. 433, 300 P.3d 679.

¶2 After remand, the jury found in favor of McCulley, awarding $1,000,000 in compensatory damages and $5,000,000 in punitive damages. Pursuant to § 27-1-221(7)(c), MCA, the District Court reviewed the punitive damages award and issued an order confirming it. The District Court also ordered post-judgment interest to accrue from the date of the court's decision confirming the award. McCulley cross-appeals from the court's determination of the date from which post-judgment interest accrues. We affirm the direct appeal and reverse the cross-appeal.

2

¶3    We address the following issues on appeal:

¶4    *1. Did the District Court abuse its discretion by excluding lay witness testimony?*

¶5    *2. Did the District Court abuse its discretion by excluding McCulley's medical records?*

¶6    *3. Did McCulley present sufficient evidence for the jury to find U.S. Bank committed actual fraud?*

¶7    *4. Did the District Court err by concluding U.S. Bank could be held liable for punitive damages arising out of Heritage Bank's pre-merger conduct?*

¶8    *5. Did the District Court err in upholding the jury's award of punitive damages?*

¶9    We address the following issue on cross-appeal:

¶10    *6. Did the District Court err by ordering the accrual of post-judgment interest from the date of its order confirming the jury's award of punitive damages?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶11    On May 1, 2006, McCulley entered into an agreement to purchase a condominium in Bozeman. On May 25, 2006, McCulley approached Heritage Bank, later purchased by U.S. Bank, and applied for a 30-year residential loan for $300,000. Jeff Mortensen (Mortensen), Heritage Bank General Manager, took McCulley's application over the phone. The following day, Mortensen emailed an internal credit memorandum to Heritage Bank Senior Vice-President, Steve Feurt (Feurt), favorably analyzing McCulley's credit, but noting that, while the condominium was "residential," the lot upon which it was built was zoned "commercial B-2." The memorandum indicated that the commercial zoning precluded the use of "standard secondary market sources for financing a residential condominium." As a result, Mortensen suggested to Feurt, and

3

Feurt approved, an 18-month, $300,000 commercial loan in lieu of the loan McCulley had requested, stating in an email: "Might be the only business we get from her. With the risk might as well make it worth our while." The Bank recognized McCulley could not pay back the $300,000 loan in 18 months due to McCulley's low income relative to the loan amount. The Bank further understood it would be very difficult for McCulley to find refinancing at the end of the 18 months because of the way in which the property was zoned. McCulley was not privy to the internal memo and was unaware of the significance of the commercial zoning. The Bank did not advise McCulley that it was changing the terms of the loan she had applied for to an 18-month commercial interest loan.

¶12 On May 30, 2006, the Bank sent McCulley a disclosure statement pursuant to the Truth-In-Lending Act (TILA)[1] regarding her loan application. The TILA disclosure statement reflected a 30-year adjustable interest rate loan for only $200,000. Upon receiving the TILA disclosure, McCulley contacted Mortensen and requested that the loan amount be raised to $300,000, as she had originally requested. Mortensen agreed to raise the amount to $300,000 after McCulley offered additional collateral. The Bank generated a Good Faith Estimate that referenced a 30-year payment plan for the proposed

---

[1] The Truth-In-Lending Act, 15 U.S.C. § 1601 et seq., is designed to "safeguard the consumer in connection with the utilization of credit by requiring full disclosure of the terms and conditions of finance charges in credit transactions or in offers to extend credit; by restricting the garnishment of wages; and by creating the National Commission on Consumer Finance to study and make recommendations on the need for further regulation of the consumer finance industry; and for other purposes." Pub. L. No. 90-321, 82 Stat. 146.

loan.[2]  The Bank did not provide a written document to McCulley explaining that the term of the loan it was approving would be changed to 18 months.  McCulley proceeded with the understanding that her loan would be for the 30-year term she had applied for, as reflected on the TILA disclosure statement and the Good Faith Estimate.

¶13  On June 16, 2006, the loan closing was held at a title company.  Mortensen was present.  McCulley was presented with a stack of documents bound by a metallic clip and directed to sign where "sign here" sticky notes had been placed on the documents.  An explanation of the individual documents was not provided to McCulley.  Included in the stack of documents were three loan applications disclosing three different and inconsistent loans to McCulley, as follows:

Loan Application 1: Amount: $300,000; Term: 18 months; Rate: 8.75%

Loan Application 2: Amount: $200,000; Term: 12 months; Rate: 8.75%

Loan Application 3: Amount: $200,000; Term: 30 years; Rate: 7.75%

The Bank also provided a disclosure form for McCulley's signature captioned: "NON ASSUMABLE FIXED RATE LOAN DISCLOSURE."  The disclosure form described the term of McCulley's loan as 30 years with an interest rate of 7.75%.  However, a loan application form for a 30-year, $300,000 loan, as requested by McCulley and promised by the Bank, was not provided.  McCulley signed all of the documents, including the three varying and inapposite loan applications, and the disclosure form, in reliance on the Bank's previous representations that the loan was for a term of 30 years.

---

[2] The Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 et seq., requires a lender, before closing, to provide a borrower with a Good Faith Estimate.

¶14    U.S. Bank acknowledged at trial it is not customary banking practice to have a borrower sign three different and inconsistent loan applications on the day of closing because it "would be misleading to the borrower." The Bank also admitted that it failed to provide McCulley with a Loan Commitment Letter, identifying the terms of the loan, although this is a customary practice in the banking industry.

¶15    McCulley made monthly payments throughout 2006 and 2007, believing the monthly payments were the required payments under a 30-year mortgage. In 2007, Heritage Bank merged with U.S. Bank. In a joint letter, Heritage Bank and U.S. Bank informed McCulley the merger would not impact her loan. In late 2007, U.S. Bank sent a notice to McCulley advising her that the balloon payment on her 18-month loan would be due in December. For the first time McCulley understood she did not have the 30-year residential mortgage for which she had applied. McCulley contacted U.S. Bank, which initially agreed to convert the loan into a 30-year term loan if McCulley made a principal reduction payment in the amount of $100,000. However, following McCulley's assent to do so, the Bank notified McCulley in writing that it would instead require a principal reduction of $200,000, and not the $100,000 previously agreed upon, to convert the loan. McCulley persisted in attempting to convince U.S. Bank to restructure the loan, but the Bank refused. McCulley was unable to locate long-term residential financing and the Bank placed the loan into foreclosure. McCulley sold her home to a buyer one week before the scheduled foreclosure sale for approximately $40,000 less than the loan balance. U.S. Bank's refusal to restructure the loan and the following foreclosure process

6

created significant emotional distress for McCulley. Though previously physically and mentally healthy, McCulley began suffering from depression, which culminated in a near-fatal suicide attempt.

¶16    In June 2009, McCulley brought this action against U.S. Bank. McCulley alleged that the Bank committed actual fraud by engaging in "bait and switch" tactics to surreptitiously alter the terms of the 30-year residential mortgage she had requested to an 18-month balloon loan. The Bank countered that it had never represented to McCulley that it had approved a 30-year residential loan. The Bank asserted it had sent McCulley a letter dated May 26, 2006, outlining the terms of her loan and explaining that she was getting an 18-month consumer bridge loan in the amount of $300,000. In a sworn affidavit, Feurt further declared that the Bank possessed a "term sheet" that set forth the correct terms of the loan. Both parties moved for summary judgment. On January 12, 2012, the District Court issued an order denying McCulley's motion for summary judgment and granting U.S. Bank's motion. McCulley appealed pro se to this Court. We reversed the grant of summary judgment, concluding, in light of the "chronology of events, and in particular noting McCulley's arguably legitimate contention that the May 26 'letter' was not a letter to her at all," that genuine issues of material fact existed. *McCulley*, ¶ 35.

¶17    During the course of litigation after remand, the District Court learned that the sworn statements made by U.S. Bank to the court, about documents accurately communicating to McCulley the terms of the 18-month loan, and on which the court had

7

relied in granting summary judgment, were inaccurate. Specifically, the court learned that the May 26 "letter" the Bank indicated had been sent to McCulley did not exist; the "term sheet" that Feurt had attested contained the terms of the loan did not exist; and affidavits submitted by the Bank indicating that it had never represented to McCulley that she would obtain a 30-year mortgage were untrue. The case was set for trial.

¶18 The jury returned a verdict in favor of McCulley on February 7, 2014. The jury awarded McCulley compensatory damages of $1,000,000 and punitive damages of $5,000,000. On April 14, 2014, the District Court entered its order affirming the punitive damages award as granted by the jury, pursuant to § 27-1-221(7)(c), MCA, and ordered that post-judgment interest would accrue from the date of its decision. Additional facts will be discussed herein.

**STANDARD OF REVIEW**

¶19 We review a district court's findings of fact to determine if they are clearly erroneous. *Weter v. Archambault*, 2002 MT 336, ¶ 18, 313 Mont. 284, 61 P.3d 771. We will not disturb the trier-of-fact's findings that punitive damages are unavailable unless they are clearly erroneous. *Weter*, ¶ 18. Findings of fact are clearly erroneous where not supported by substantial evidence, where the court misapprehends the effect of the evidence, or where this Court's consideration of the record results in a firm conviction that a mistake has been made. *Weter*, ¶ 18. "We review a district court's conclusions of law to determine if they are correct." *Weter*, ¶ 18.

8

¶20    We apply a de novo standard of review when reviewing a district court's determination of the constitutionality of punitive damages awards. *Seltzer v. Morton*, 2007 MT 62, ¶ 152, 336 Mont. 225, 154 P.3d 561 ("We must conduct de novo review of the District Court's application of the *Gore* guideposts to the jury's punitive damages verdict.").

¶21    We review a district court's evidentiary ruling for an abuse of discretion. The district court is vested with broad discretion in controlling the admission of evidence at trial. *State v. Nichols*, 2014 MT 343, ¶ 8, 377 Mont. 384, 339 P.3d 1274. "Authenticity for admissibility can be demonstrated by direct or circumstantial evidence and sufficiency of the evidence for foundation is within the discretion of the trial judge." *State v. Cooper*, 161 Mont. 85, 92, 504 P.2d 978, 982 (1972).

¶22    We review a district court's discovery ruling for an abuse of discretion. *Pallister v. Blue Cross & Blue Shield of Mont., Inc.*, 2012 MT 198, ¶ 9, 366 Mont. 175, 285 P.3d 562.

## DISCUSSION

¶23    *1. Did the District Court abuse its discretion by excluding lay witness testimony?*

¶24    During examination by McCulley's counsel, Mortensen contradicted the testimony he gave in his deposition after referring to his personal journals. Mortensen had provided the journals to the Bank two days before trial, but the Bank did not provide them to McCulley. Outside the presence of the jury, McCulley moved in limine to exclude Mortensen's testimony from his journals on the ground the Bank had breached its duty to

9

supplement discovery by failing to disclose them. The Bank responded that it had received the journals only days before trial and that McCulley had not issued a *subpoena duces tecum* upon Mortensen. The court found the personal journals were responsive to McCulley's Requests for Production Nos. 1 and 7 and U.S. Bank should have supplemented its discovery responses by providing them. The District Court ordered the Bank to immediately supplement discovery by producing the journals, and granted McCulley's motion precluding Mortensen from testifying based on the journals.

¶25 M. R. Civ. P. 26(e)(1) imposes a duty on a party who has responded to a request for production to supplement its response "in a timely manner if the party learns that in some material respect the response is incomplete or incorrect . . . ." M. R. Civ. P. 37(c)(1) further provides that if a party fails to supplement an earlier discovery response, "the *party is not allowed to use that information or witness to supply evidence* . . . at a trial, unless the failure was substantially justified or is harmless." (Emphasis added.) "The party facing sanctions bears the burden of proving that its failure to disclose the required information was substantially justified or is harmless." *R & R Sails, Inc. v. Ins. Co. of the Pa.*, 673 F.3d 1240, 1246 (9th Cir. 2012). We have explained "the imposition of sanctions for failure to comply with discovery procedures is regarded with favor." *Richardson v. State*, 2006 MT 43, ¶ 56, 331 Mont. 231,130 P.3d 634. "[T]he price for dishonesty must be made unbearable to thwart the inevitable temptation that zealous advocacy inspires." *Richardson*, ¶ 56 (citation and internal quotation omitted).

¶26 U.S. Bank argues the court erred by preventing Mortensen from testifying based on the journals. The Bank asserts that had Mortensen been able to so testify, he would have rebutted "every significant statement" in McCulley's testimony. The Bank cites M. R. Evid. 612 to support its contention that, because it allowed the journals to be reviewed following the District Court's order, the court was without authority to preclude any testimony that may have been supplied by the journals. M. R. Evid. 612 provides:

> If a witness uses a writing to refresh memory for the purpose of testifying, either
>
> (1) while testifying, or
>
> (2) *before testifying, if the court in its discretion determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced at the hearing*, to inspect it, to cross-examine the witness thereon, and to introduce into evidence those portions which relate to the testimony of the witness. If it is claimed that the writing contains matters not related to the subject matter of the testimony the court shall examine the writing in camera, excise any portions not so related, and order delivery of the remainder to the party entitled thereto. Any portion withheld over objection shall be preserved and made available to the appellate court in the event of an appeal. *If a writing is not produced or delivered pursuant to order under this rule, the court shall make any order justice requires*, except that in criminal cases when the prosecution elects not to comply, the order shall be one striking the testimony or, if the court in its discretion determines that the interests of justice so require, declaring a mistrial. [Emphasis added.]

U.S. Bank contends, alternatively, that it was under no duty to supplement discovery under M. R. Civ. P. 26(e)(1) because the journals were never in the U.S. Bank's "legal custody" during discovery. The Bank reasons the journals were privileged as Mortensen provided them "on condition of non-dissemination."

11

¶27 We are not persuaded by the Bank's arguments. First, assuming that the Bank complied with the Rules of Evidence by following M. R. Evid. 612, such compliance does not obviate the Bank's duty under M. R. Civ. P. 26(e)(1) to supplement discovery. Second, the Bank is not the arbiter of whether a document is privileged. If the Bank believed the journals contained privileged materials, it still had a duty to supplement its responses and advise McCulley that it had come into possession of the documents. However, the Bank instead attempted to litigate by ambush, which the court rightly prohibited. Once the Bank failed to supplement its response, and thereby breached its duty, the District Court was constrained by M. R. Civ. P. 37(c)(1) to exclude the journals, unless the Bank could establish that its failure was substantially justified or harmless. The Bank has not attempted to justify its failure to supplement or establish the error was harmless. Accordingly, the District Court did not abuse its discretion by precluding U.S. Bank from using the personal journals to supply evidence through Mortensen's testimony.

¶28 *2. Did the District Court abuse its discretion by excluding McCulley's medical records?*

¶29 During cross-examination of McCulley, the Bank sought to introduce her medical records in an attempt to show McCulley told medical personnel that she was not suicidal after the foreclosure. McCulley did not prepare the medical records, disputed their authenticity, and objected to the way in which the Bank was attempting to use the records. McCulley asserted it was unclear whether the "progress notes" on the medical records, which the Bank was attempting to introduce into evidence, were actually in

12

reference to her. The District Court excluded the documents and explained to the Bank it needed to lay a proper foundation. The Bank did not attempt further to lay a foundation through the testimony of a preparer or custodian of the records.

¶30　M. R. Evid. 901 requires authentication of evidence as a condition precedent to admissibility, if it is not self-authenticating. The requirement "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." M. R. Evid. 901(a). We have explained that "medical records are not ordinarily self-authenticating and require proper foundation before they are admissible." *Cheff v. BNSF Ry. Co.*, 2010 MT 235, ¶ 39, 358 Mont. 144, 243 P.3d 1115.

¶31　The Bank offers that McCulley stipulated to the authenticity of her medical records because she produced the documents in discovery pursuant to M. R. Civ. P. 26(g)(1). However, the only authority provided by the Bank for this proposition is M. R. Civ. P. 36(a)(1)(B), which permits a party to request that another party admit the "genuineness of any described documents." The record does not indicate the Bank ever requested McCulley to admit the genuineness of the medical records. Thus, McCulley merely verified the production of the documents under M. R. Civ. P. 26(g)(1). The Bank cannot transform McCulley's discovery verification into a stipulation of admissibility.

¶32　Given the Bank's failure to properly lay a foundation, the District Court did not abuse its discretion by excluding the medical records.[3]

---

[3] The Bank also raises evidentiary issues regarding evidence of McCulley's bad acts. However, the Bank failed to raise those issues before the District Court and they are waived on appeal. *See Gary & Leo's Fresh Foods, Inc. v. State*, 2012 MT 219, ¶ 16, 366 Mont. 313, 286 P.3d 1218.

¶33   *3. Did McCulley present sufficient evidence for the jury to find U.S. Bank committed actual fraud?*

¶34   The Bank contends McCulley failed to present sufficient evidence to demonstrate actual fraud.  A party asserting a claim of actual fraud must establish the following elements: (1) a representation; (2) falsity of the representation; (3) materiality of the representation; (4) speaker's knowledge of the falsity of the representation or ignorance of its truth; (5) speaker's intent that it be relied upon; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation; (8) the hearer's right to rely on the representation; and (9) the hearer's consequent and proximate injury caused by the reliance on the representation.  *Morrow v. Bank of Am., N.A.*, 2014 MT 117, ¶ 57, 375 Mont. 38, 324 P.3d 1167.  The elements of actual fraud "hinge on the knowledge and intent of the defendant."  *Durbin v. Ross*, 276 Mont. 463, 470, 916 P.2d 758, 762 (1996) (citation and brackets omitted).  The Bank challenges the sufficiency of three of the nine elements of fraud, disputing that there is evidence of a false representation, that the Bank knew its representation was false, and that the Bank intended McCulley to rely on it.

¶35   We do not assume the role of the jury on appeal, "but will only review the record to search for sufficient evidence to support the jury's conclusions."  *Drilcon, Inc. v. Roil Energy Corp.*, 230 Mont. 166, 178, 749 P.2d 1058, 1065 (1988).  In reviewing the record, "we must view the evidence in the light most favorable to the prevailing party."  *Seltzer*, ¶ 94.

14

¶36    We conclude McCulley presented sufficient evidence for the jury to find U.S. Bank committed actual fraud. While the Bank largely seeks to relitigate the case on appeal, the evidence presented at trial was sufficient for the jury to find that McCulley was given a deceptive offer by the Bank in response to her loan inquiry, and, having obtained her audience, the Bank secretly switched the terms of the loan to the Bank's benefit and McCulley's detriment. McCulley testified that the Bank falsely represented she would be given a 30-year, residential mortgage loan. McCulley's testimony was corroborated by both the TILA statement and the Good Faith Estimate indicating her loan would be for a 30-year term consistent with her initial loan application, not an 18-month loan. The Bank failed to disclose that it was offering only a bridge loan. The Bank added to its deception by presenting three separate and inconsistent loan applications for McCulley's signature at closing; an additional disclosure form on the day of closing, which stated terms consistent with the loan for which she had applied; and, in contrast to standard banking practice, the Bank failed to provide McCulley documentation reflecting the Bank's change of the terms of the loan. The Bank's internal communications and other circumstantial evidence demonstrate the Bank knew at the time it sent the falsely stated documents to McCulley that, to the contrary, she would not receive a 30-year, residential loan. The evidence also established the Bank knew she could not repay the 18-month loan that it supplied in place of the loan McCulley requested. Lastly, McCulley presented evidence that she lacked knowledge of the falsity of the Bank's representations when the fraudulent conduct occurred and thus she had the right to rely

15

on the representations. Although we cannot know what evidence the jury found persuasive, we can conclude there was sufficient evidence for the jury to have reached its verdict. Therefore, we hold that McCulley presented evidence sufficient to demonstrate the Bank committed actual fraud.

¶37 *4. Did the District Court err by concluding U.S. Bank could be held liable for punitive damages arising out of Heritage Bank's pre-merger conduct?*

¶38 The Bank argues that, as a successor corporation, it cannot be held liable for punitive damages arising out of Heritage Bank's pre-merger actions.[4] It reasons that punitive damages are designed to punish the tortfeasor and not successor corporations. The Bank does not dispute that the merger agreement between it and Heritage Bank contained assumption-of-liability language required by the federal Bank Merger Act governing mergers of national banks.

¶39 12 U.S.C. § 215a(a)(4) of the Act requires that any merger agreement involving the merger of national banking associations or state banks into a single national banking association "provide that the receiving association shall be liable for all liabilities of the association or State bank being merged into the receiving association." 12 U.S.C. § 215a(e) further provides that the "corporate existence of each of the merging banks or banking associations participating in such merger shall be merged into and continued in the receiving association and such receiving association shall be deemed to be the same corporation as each bank or banking association participating in the merger." Similarly,

---

[4] The Bank does not contend the jury should have only been able to consider the net worth of Heritage Bank at the time of the wrongdoing.

under Montana law a survivor corporation is responsible for "all liabilities of each corporation" with which it has merged. Section 35-1-817(1)(c), MCA. A survivor corporation is the single corporation that is formed by the parties. Section 35-1-817(1)(a), MCA.

¶40    Since a successor bank is deemed to be "the same corporation" as the merging banks and is responsible "for *all* liabilities" of the merging banks under both federal law and Montana law, respect for ordinary language dictates that U.S. Bank be held liable for *all* damages, including punitive damages. *See also Culbreath v. First State Bank Nat'l Ass'n*, 44 S.W.3d 518, 525 (Tenn. 2001) ("If we were to interpret 'all liabilities' in 12 U.S.C. § 215a(a)(4) to exclude punitive damages, we would be ignoring the ordinary meaning of the word 'all'"). While U.S. Bank is correct in its argument that punitive damages are designed to punish *the tortfeasor*, they also exist to set an example and thereby deter others from engaging in similar conduct. *See* § 27-1-220, MCA. Courts interpreting the Bank Merger Act in the context of lender liability suits have recognized "[t]he existence of such successor liability may positively influence the conduct of predecessor companies or banks which wish to remain marketable for future mergers or acquisitions." *Busy Bee, Inc. v. Wachovia Bank*, 73 Pa. D. & C.4th 135, 146 (Lacka. Co. 2005). "Realization that their companies will sell for less, or not at all, if they engage in reckless behavior provides an incentive for acquisition candidates to conform their behavior to socially acceptable norms." *Man v. Raymark Indus.*, 728 F. Supp. 1461, 1471 (D. Hawaii 1989) (quoting *Celotex Corp. v. Pickett*, 490 So. 2d 35, 38 (Fla. 1986)).

17

¶41 We conclude the District Court did not err in holding U.S. Bank liable for all damages, including punitive damages, arising out of Heritage Bank's pre-merger conduct.

¶42 *5. Did the District Court err in upholding the jury's award of punitive damages?*

¶43 U.S. Bank challenges the jury's punitive damages award on the ground it was grossly excessive in violation of the Due Process Clause under the United States Supreme Court's decision in *BMW of N. Am. v. Gore*, 517 U.S. 559, 116 S. Ct. 1589 (1996). Punitive damages may be imposed "to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." *Gore*, 517 U.S. at 568, 116 S. Ct. at 1595. "States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case." *Gore*, 517 U.S. at 568, 116 S. Ct. at 1595. However, "when an award can fairly be categorized as 'grossly excessive'" it enters the "zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." *Gore*, 517 U.S. at 568, 116 S. Ct. at 1595.

¶44 The trial judge "shall review a jury award of punitive damages." Section 27-1-221(7)(c), MCA. In determining whether a punitive damages award is grossly excessive under the Due Process Clause, a court must consider three "guideposts" announced in *Gore*: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity, or ratio, between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages

18

awarded by the jury and the civil penalties authorized or imposed in comparable cases. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418, 123 S. Ct. 1513, 1520 (2003) (citing *Gore*, 517 U.S. at 575, 116 S. Ct. at 1598).  We conduct a de novo review of the jury's punitive damages award in applying the three guideposts.  *Seltzer*, ¶ 152.

***Reprehensibility***

¶45   The U.S. Supreme Court stated in *Gore* that "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct."  *Gore*, 517 U.S. at 575, 116 S. Ct. at 1599.  Punitive damages "imposed on a defendant should reflect the enormity of his offense."  *Gore*, 517 U.S. at 575, 116 S. Ct. at 1599 (quotations omitted).  The U.S. Supreme Court has instructed lower courts to determine the reprehensibility of a defendant by considering whether:

> [T]he harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Campbell*, 538 U.S. at 419, 123 S. Ct. at 1521.  "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect."  *Campbell*, 538 U.S. at 419, 123 S. Ct. at 1521.

*(i) Physical or Economic Harm*

¶46   The Bank argues the injuries sustained by McCulley were "primarily economical," but concedes that McCulley did suffer emotional harm.  The Bank's conduct caused

19

McCulley serious emotional distress that directly contributed to her suicide attempt. McCulley had previously been physically and mentally healthy, but as a result of U.S. Bank's conduct began suffering from depression and isolation. While McCulley sustained substantial economic harm, her serious emotional damage does not permit the conclusion that she suffered only economic loss.

*(ii) Indifference to or Reckless Disregard for the Safety of Others*

¶47 The second factor in assessing reprehensibility is whether the Bank exhibited indifference or reckless disregard for the health and safety of McCulley. The Bank knew McCulley may well lose her home when it switched the terms of her loan and thus knew its conduct could cause serious emotional distress to McCulley. McCulley worked in good faith to negotiate a change in loan terms, and the Bank agreed, only to renege when McCulley attempted to honor the agreement. The Bank was clearly indifferent to the loss of McCulley's home and its actions resulted in a suicide attempt that threatened McCulley's personal safety.

*(iii) Financially Vulnerable Target*

¶48 The financial vulnerability of a plaintiff is particularly important when there is an "infliction of economic injury, especially when done intentionally through affirmative acts of misconduct" and in such a case may "warrant a substantial penalty." *Gore*, 517 U.S. at 576, 116 S. Ct. at 1599. McCulley testified at length about her financial vulnerability and her lack of sophistication. McCulley indicated she did not know what a promissory note was or what the word "collateral" meant, and that she was accustomed to

relying on representations of bankers in real estate transactions. The Bank knew of McCulley's financial vulnerably and there was evidence that purported to establish that this was the Bank's motivation in switching the terms of the loan. Further, the resulting loss of McCulley's home removes all doubt that she was financially vulnerable. Accordingly, this factor favors the jury's award.

*(iv) Repeated Actions or Isolated Conduct*

¶49    The U.S. Supreme Court in *Gore* "recognize[d] that repeated misconduct is more reprehensible than an individual instance of malfeasance." *Gore*, 517 U.S. at 577, 116 S. Ct. at 1599-1600. The Bank characterizes its conduct as a "single, isolated incident" because no "other consumer was injured by the Bank's actions." However, as both the Colorado Supreme Court and Third Circuit have explained, "'while the "repeated conduct" [factor] will necessarily have less force where the defendant's misconduct did not extend beyond his dealings with the plaintiff, it may still be relevant in measuring the reprehensibility of the defendant's conduct, based on the particular facts and circumstances presented.'" *Qwest Servs. Corp. v. Blood*, 252 P.3d 1071, 1096 (Colo. 2011) (quoting *CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*, 499 F.3d 184, 191 (3d Cir. 2007)).

¶50    It is true that the conduct at issue here is limited to a single loan transaction. However, the facts demonstrate that the Bank's misconduct included multiple separate acts. The Bank deceived McCulley by switching the terms of the loan and then by supplying a TILA statement and a Good Faith Estimate prior to closing that matched the

21

30-year term for which McCulley had applied. The Bank presented three inconsistent loan applications at closing. The Bank provided a disclosure form that was inconsistent with the three loan applications, but consistent with the loan McCulley had requested. The Bank failed to deliver, at a later date, any written notice to McCulley showing the loan terms were not as presented, until the notice the balloon payment was due. The Bank represented to McCulley it would give her a 30-year mortgage if she paid $100,000 on the principal of the 18-month loan. When she agreed, the Bank failed to honor its commitment and requested an additional $100,000 payment. As the District Court found, the Bank "was well collateralized" and capable of rectifying the wrong "at all times." However, the Bank nonetheless initiated foreclosure proceedings on McCulley's condominium. U.S. Bank's multiple acts here weigh in favor of the jury's punitive damages award.

*(v) Intentional Malice, Trickery, or Deceit, or Mere Accident*

¶51    Lastly, we consider whether the harm caused by U.S. Bank was the result of intentional malice, trickery, or deceit, or mere accident. The District Court noted in detail the nature of the Bank's predatory lending, specifying in particular that its deceptive conduct placed McCulley in a situation of peril where it was all but certain the loan would end in foreclosure:

> The Bank knew McCulley could not pay back a $300,000 in 18 months, and that she would find refinancing "very difficult." At the time the Bank approved the loan, it knew that the [condominium] was a mixed use building so the mortgage loan would not meet the underwriting standard of the secondary market into which such loans are sold. The consequence of this, which was known to the Bank, was that McCulley would be unlikely

22

to obtain long-term financing. The Bank failed to disclose this fact to McCulley, either verbally or in writing.

This was not merely a case of a bank failing to apprise an unsophisticated buyer of the associated risks in purchasing her home; nor of a bank mistakenly and unintentionally changing the terms of the loan due to clerical errors. Here, the District Court found, in accordance with the jury's verdict, that the Bank intentionally tricked McCulley by changing the loan from one that her finances *could support* to one that it knew her finances *could not support*. And when the situation played out as the Bank predicted, it initiated foreclosure on McCulley's home. We conclude that U.S. Bank's "bait-and-switch" tactics counsel in favor of the award.

¶52 In sum, the five factors given by the U.S. Supreme Court to evaluate the most important guidepost, reprehensibility of the defendant's conduct, weigh in favor of affirming the punitive damages award.

*Ratio*

¶53 Turning to the second guidepost, we examine the ratio between the punitive and compensatory damages. *Campbell*, 538 U.S. at 418, 123 S. Ct. at 1520. Although the U.S. Supreme Court has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula," *Gore*, 517 U.S. at 582, 116 S. Ct. at 1602, the Court has provided "instructive" numerical guidelines:

> [F]ew awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. . . . Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards

23

with ratios in range of 500 to 1, [as in *Gore* ], or, [as in *Campbell* ], of 145 to 1.

*Campbell*, 538 U.S. at 425, 123 S. Ct. at 1524.

¶54    In this case, the ratio of punitive damages to compensatory damages is 5:1, which fits comfortably within the single-digit instructive numerical guidelines. Additionally, the award ratio is lower than previous award ratios upheld by this Court. *See Seltzer*, ¶ 199 (upholding 9:1 punitive to compensatory damages award) and *Marie Deonier & Assocs. v. Paul Revere Life Ins. Co.*, 2004 MT 297, ¶ 67, 323 Mont. 387, 101 P.3d 742 (reinstating 6.67:1 punitive to compensatory damages award). The single-digit ratio under the second *Gore* guidepost lends support to the jury's punitive damages award.

### Comparable Penalties

¶55    The last *Gore* guidepost requires that we consider "the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Seltzer*, ¶ 190 (citing *Campbell*, 538 U.S. at 418, 123 S. Ct. at 1520). "[A] reviewing court engaged in determining whether an award of punitive damages is excessive should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." *Seltzer*, ¶ 190 (citing *Gore*, 517 U.S. at 583, 116 S. Ct. at 1603). Neither party addresses the third guidepost or provides authority for civil sanctions. However, we note several state courts, including this Court, have sustained punitive damages awards when the last guidepost did not completely counsel in support of the award. *See Seltzer*, ¶ 199 (upholding a punitive damages award of $9.9 million despite not mentioning appropriate civil sanctions for the conduct at

24

issue); *Lewellen v. Franklin*, 441 S.W.3d 136, 148 (Mo. 2014) (upholding punitive damages award of $1 million against only $5,000 in possible civil sanctions); *Campbell v. State Farm Mut. Auto. Ins. Co.*, 2004 UT 34, ¶ 45, 98 P.3d 409 (Utah 2004) (upholding $9,018,780.75 in punitive damages against only a $10,000 civil penalty for the conduct at issue). The Montana Legislature has limited punitive damages awards by enacting § 27-1-220(3), MCA, which provides: "An award for punitive damages may not exceed $10 million or 3% of a defendant's net worth, whichever is less." Although this cap is not at issue here, it does provide an indication of what the Legislature views as "grossly excessive." Under the last guidepost, the Legislature is entitled to deference in legislating in the area of punitive damages and § 27-1-220(3), MCA, is a relevant consideration that favors upholding the punitive damages award.

¶56 In light of the degree of reprehensibility of U.S. Bank's conduct, the single-digit ratio between punitive and compensatory damages, and in deference to the Legislature's expressions, we conclude that, taken together, the *Gore* guideposts support the award of punitive damages. Accordingly, the District Court did not err in upholding the jury's punitive damages verdict.

¶57 *6. Did the District Court err by ordering the accrual of post-judgment interest from the date of its order confirming the jury's award of punitive damages?*

¶58 Section 25-9-204, MCA, provides, the "clerk shall include in *the judgment . . .* any interest on the *verdict* or *decision* of the court, from the time *it* was *rendered* or *made*." (Emphasis added.) In her cross-appeal, McCulley argues that the appropriate date from which post-judgment interest should accrue is the date of the "verdict," February 7, 2014,

and not the date of the District Court's later "decision" to affirm the jury's award of punitive damages, April 14, 2014. McCulley reasons that the statute is unambiguous in its requirement that post-judgment interest accrues from the date the jury's "verdict" is "rendered." The Bank contends that the statute is unambiguous in its requirement that post-judgment interest accrues from the date that the "decision of the court" is "made." Neither of these approaches solves the dilemma of interpreting the statute as a whole.

¶59 We interpret a statute by first looking to the statute's plain language. *State v. Letasky*, 2007 MT 51, ¶ 11, 336 Mont. 178, 152 P.3d 1288. We construe a statute by "reading and interpreting the statute as a whole, 'without isolating specific terms from the context in which they are used by the Legislature.'" *State v. Triplett*, 2008 MT 360, ¶ 25, 346 Mont. 383, 195 P.3d 819 (quoting *Mont. Sports Shooting Ass'n v. State*, 2008 MT 190, ¶ 11, 344 Mont. 1, 185 P.3d 1003). We also "read and construe each statute as a whole so as to avoid an absurd result and to give effect to the purpose of the statute." *Triplett*, ¶ 25 (internal quotations omitted). "Where there are several provisions or particulars" of a statute, "such a construction is, if possible, to be adopted as will give effect to all." Section 1-2-101, MCA.

¶60 In *Hulstine v. Lennox Indus.*, 2010 MT 180, 357 Mont. 228, 237 P.3d 1277, we were faced with the question under this statute of whether interest should accrue from the date of the district court's entry of "judgment" or the date of the jury's "verdict." *Hulstine*, ¶ 27. We concluded that "Section 25-9-204, MCA, clearly and unambiguously allows post-judgment interest from the time the verdict was rendered." *Hulstine*, ¶ 28.

26

Thus, we implicitly decided that the pronoun "it" used in § 25-9-204, MCA, did not refer to "judgment," but instead referenced "verdict or decision."

¶61 The plain language of the statute appears to correlate the phrase "verdict or decision" with the phrase "rendered or made" so that interest will be assessed on damages whether awarded by a jury ("interest on the verdict . . . from the time it was rendered") or by a judge ("interest on the . . . decision of the court, from the time it was . . . made."). The apparent intention is to assess interest from the time the damages award is entered, whether by a jury or by a judge acting as factfinder. *See* § 27-1-221(7)(b), MCA (governing awards of punitive damages by judge acting as factfinder). This rendering of the language gives effect to all of the provisions and is consistent with our decision in *Hulstine* interpreting the statute to assess interest from the date of the verdict, as well as with the purpose of the statute. "The purpose of postjudgment interest is to compensate a successful plaintiff for being deprived of compensation for the loss during the time between ascertainment of the damage and payment by the defendant." 47 C.J.S. *Interest & Usury* § 120 (2014). In a jury trial, the damages are "ascertained" at the time of the verdict. Although a jury's damages award could later be "increased or decreased," § 27-1-221(7)(c), MCA, by the trial court, the calculation of accruing interest can be adjusted to reflect the adjusted award in that event.

¶62 While our precedent is at odds with the federal courts, they have recognized that the purpose of post-judgment interest favors accruing the interest as of the date of the verdict. In *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, the U.S. Supreme Court

27

addressed the issue we addressed in *Hulstine*: "whether interest should be calculated from the date of verdict or the date of judgment[.]" *Kaiser Aluminum & Chem. Corp.*, 494 U.S. 827, 834, 110 S. Ct. 1570, 1575 (1990). The U.S. Supreme Court explained the federal statute at issue, 28 U.S.C. § 1961, "refer[red] specifically to the 'date of judgment,'" and thus the Court "conclude[d] that postjudgment interest properly runs from the date of the entry of judgment." *Kaiser Aluminum & Chem. Corp*, 494 U.S. at 835, 110 S. Ct. at 1576. Nonetheless, in rationalizing its holding the U.S. Supreme Court explained its decision conflicted with the purposes of post-judgment interest: "Even though denial of interest from verdict to judgment may result in the plaintiff bearing the burden of the loss of the use of the money from verdict to judgment, the allocation of the costs accruing from litigation is a matter for the legislature, not the courts." *Kaiser Aluminum & Chem. Corp.*, 494 U.S. at 835, 110 S. Ct. at 1576.

¶63 For the foregoing reasons, we conclude the District Court erred by ordering accrual of post-judgment interest from the date of its decision. The court should have ordered accrual of interest from the date of the jury's verdict on February 7, 2014.

¶64 Affirmed in part and reversed in part.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER

28