FILED

December 30 2014

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 13-0163

DA 13-0163

IN THE SUPREME COURT OF THE STATE OF MONTANA

2014 MT 343

STATE OF MONTANA,

      Plaintiff and Appellee,

v.

THOMAS RICHARD NICHOLS,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DC 10-420A
Honorable Ted O. Lympus, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Gregory D. Birdsong, Birdsong Law Office, P.C., Missoula, Montana

      For Appellee:

            Timothy C. Fox, Montana Attorney General; Tammy K Plubell, Assistant
Attorney General, Helena, Montana

            Ed Corrigan, Flathead County Attorney; Travis Ahner, Deputy County
Attorney, Kalispell, Montana

Submitted on Briefs:  October 29, 2014
Decided:  December 30, 2014

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1    Thomas Richard Nichols appeals from the entry of judgment by the Eleventh Judicial District Court, Flathead County, convicting him of Sexual Assault and Sexual Intercourse Without Consent.  Nichols challenges the District Court's admission of testimony regarding his character and sexual habits, permitting a primary investigator to act as a representative of the State and testify during trial, and entering judgment of guilt of both Sexual Assault and Sexual Intercourse Without Consent, where the charges arose from a single incident.  He also asserts that he is entitled to a new trial due to ineffective assistance of counsel.  We reverse and remand, addressing two issues:

1.  *Did the District Court err by allowing the State to elicit testimony regarding Nichols' sexual habits?*

2.  *Did the District Court err by allowing a primary investigator to act as both a representative of the State and a witness during trial?*

### FACTUAL AND PROCEDURAL BACKGROUND

¶2    In January 2010, Nichols and his girlfriend Kay Lynn had a baby.  Shortly thereafter, the couple moved in with Kay Lynn's family, including her nine year old sister, T.K.  Nichols remained at the home for about three weeks until moving out on February 9, 2010.  Within a month, Kay Lynn followed Nichols.  Approximately two days later, T.K. told her mother that "Tom touched me."  Upon further questioning, T.K. indicated to her mother that Nichols had touched her "crotch area."  When asked why she had not said anything sooner, T.K. responded she was afraid her mother would be angry.

2

When T.K.'s mother hugged her and said it was not her fault, T.K. "kind of broke down" and told her mom she was glad she had gotten it off of her chest.

¶3 T.K.'s father contacted law enforcement after learning of the alleged assault. T.K. was interviewed by Megan Breining, a forensic interviewer for the Flathead County Sheriff's Office. Although noting that she was nervous, Breining found T.K. had no problem giving a narrative response when prompted with open-ended questions. According to T.K., she had been watching a movie in the computer room of her home with Nichols and her brother while the rest of the family was watching television across the hall in the family room. T.K.'s father testified at trial that he "kept opening" the door to the computer room because "it seemed to keep getting closed." T.K stated that her brother left prior to the movie's end, and about five minutes later Nichols asked T.K. if he could "touch her somewhere." After T.K. asked Nichols where he wanted to touch her, he pointed to her "crotch area."

¶4 T.K. said she did not know what to do but responded "I guess." Nichols then asked T.K. to pull her pants down, which she did. T.K. says Nichols then touched her "in her crotch," and "kind of rub[ed], like in a circle." T.K. stated Nichols was using his "pointer finger" and was "kind of digging." T.K. stated Nichols then asked how it felt, to which she responded "it kind of hurts." T.K. asserts Nichols then offered her $10 to "let [him] play with it." Nichols told T.K. he did not mean to make her uncomfortable, but she could "touch [his]." T.K. then said "[n]o, that's gross" and pulled her pants back up, at which point they continued watching the movie.

3

¶5   T.K. stated that later she felt uncomfortable and left to join the rest of her family across the hall in the family room. Nichols followed her to the family room shortly thereafter. T.K. stated she did not tell anyone immediately because she felt "awkward" and did not want to talk about it. T.K. was examined by Debbie Mulcahy, an emergency room nurse and sexual assault nurse examiner, in March 2010. Mulcahy found T.K. to have a "normal examination," which she found unsurprising because injuries are typically observed in only three to five percent of sexual assault patients.

¶6   Nichols was interviewed by Detective Buls, an investigator with the Flathead County Sheriff's Office specializing in crimes against children. Nichols told Buls he had only lived at T.K.'s house for a few weeks because his relationship with her parents was strained. During the interview, Nichols confirmed he had watched a movie with T.K. and her brother in the computer room and had been alone with her at some point.

¶7   Nichols was charged by Information with the offense of Sexual Assault and arrested. The State amended the Information to also charge Nichols with Sexual Intercourse Without Consent. While awaiting trial, Nichols was incarcerated and housed with several other inmates who later testified concerning an alleged confession by Nichols and about his telephone conversations with Kay Lynn. The trial commenced on November 28, 2011, and three days later the jury found Nichols guilty of both counts. Nichols appeals.

**STANDARDS OF REVIEW**

¶8     District Courts are vested with broad discretion in controlling the admission of evidence at trial. *Seltzer v. Morton*, 2007 MT 62, ¶ 65, 336 Mont. 225, 154 P.3d 561. When reviewing a district court's evidentiary ruling, this Court determines only whether a lower court abused its discretion. *Seltzer*, ¶ 65. When a court's ruling is based on an interpretation of an evidentiary rule or statute, our review is de novo. *State v. Derbyshire*, 2009 MT 27, ¶ 19, 349 Mont. 114, 201 P.3d 811.

**DISCUSSION**

¶9     *1. Did the District Court err by allowing the State to elicit testimony regarding Nichols' sexual habits?*

¶10     At trial, the State elicited testimony about the personal sexual habits of Nichols, his allegedly strained relationship with T.K.'s parents, and his prior work history. Because our holding is based on the testimony about Nichols' sexual habits, our discussion will focus on that testimony. Nichols objected to the questions regarding this evidence, but his objections were overruled based on the prosecution's position that defense counsel had opened the door to the questioning during his opening statement by stating that Nichols had no reason to molest T.K. because of his "healthy, active sex life with Kay Lynn . . . ." Nichols argues the evidence was irrelevant and admitted for the purposes of alienating the jury and obtaining a conviction in a weak case. He argues that, even if relevant, the evidence should have been excluded under M. R. Evid. 403 as unfairly prejudicial. The challenged testimony was elicited from the following witnesses.

5

**1. Kay Lynn**

¶11    The State pursued invasive questioning of Nichols' girlfriend, Kay Lynn, during its direct examination of her. Nichols' objections are here omitted and instead discussed below:

Q. Okay. Isn't it true, though, that there's been times in the past when [Nichols] cheated on you, that despite your healthy sexual lifestyle he's gone off and done stuff with other girls?

A. No.

Q. That's not true?

A. No.

Q. Okay. So there wasn't a time that you walked in on him?

A. No.

Q. Okay.

A. I don't know what you're talking about, but no, they weren't doing anything.

Q. Okay. There wasn't a time when Tom and another girl were doing something, you walked in, and he asked you to join?

A. No.

Q. Okay. So if the two of you—if Tom and you had a discussion over a recorded jail call about an incident like that you both would have been just out of your mind?

A. No. What happened was completely different than that.

Q. What happened?

A. Well, sometimes when we were doing stuff we had other people, but it was always between both of us, you know, like we would discuss it first, he never cheated on me. But—

Q. So this incident when you're on the tape and you tell him "remember the time that I walked in, you were doing stuff, but I was on the rag" — meaning on your period, so you couldn't participate, and so you left and they just continued doing stuff? Do you remember telling that? Because I can play the tape if you like.

A. But they stopped when I said that I was on the rag. . . .

.    .    .

Q. Okay. Did Tom ever talk to you about doing—doing unusual sexual things?

A. Um, can you define unusual?

Q. I—

A. To an extent, but like—I don't know, I consider what we do kind of unusual, but—

Q. Okay.

A. —nothing, like, really unusual, like—

Q. Okay. Do you know what fisting is?

A. Huh?

Q. Do you know what fisting is?

A. Yes.

Q. Did you ever talk with Tom about fisting?

A. Sometimes.

Q. Do you know what red wings are?

A. Yes.

7

Q. Okay, Tom indicated there was a time when the two of you engaged in sexual activities and you were on your period, and that was considered red wings. Do you recall what Tom said as far as payback?

. . .

Q. Do you recall him saying that he would be inside of you during your period and then he would make you suck his penis and lick it off?

¶12 Defense counsel objected to the State's asking whether Nichols had "gone off and done stuff with other girls." The State responded that the defense had opened the door to questions about Nichols' private sex life, referencing defense counsel's reference to Nichols' "healthy, active sex life" during his opening statement. The State further argued the testimony was relevant because it "questions impeachment with regards to this witness and whether or not she's being forthright, it also is relevant with respect to whether or not Tom has gone searching around for other women despite his relationship with [Kay Lynn]." Overruling the objection, the District Court urged the State to "keep it within a certain range." After the State's questions concerning fisting and menstrual sex, defense counsel again objected, arguing the testimony was irrelevant. The court overruled the objection, stating only that Kay Lynn was "an adverse witness obviously." A recording of a conversation between Kay Lynn and Nichols discussing sexual matters was then played for the jury.

¶13 On appeal, the State acknowledges that the relevance of some of Kay Lynn's testimony was "tenuous," but argues the questions were relevant due to defense counsel's opening statement comment, which suggested he was prepared to open up at least some aspects of his sexual relationship with Kay Lynn. The State argues the testimony was

8

related to Kay Lynn's potential bias as a witness, which was consistent with the District Court's statement that she was an adverse witness.[1]   The State further argues the questioning was harmless, as there was no reasonable possibility the evidence of Nichols' private sexual practices influenced his conviction, given the sufficiency of evidence to convict him without the disputed testimony.

### 2. Noah Powell

¶14   Noah Powell had been in custody with Nichols and was called by the State. Powell testified that he had overheard Nichols call Kay Lynn a "slut" and sometimes told her to "shut up." Nichols objected to the testimony on relevancy grounds.  The State responded that the testimony was offered in response to defense counsel's reference in his opening statement to Nichols' active and healthy sex life with Kay Lynn.  The court overruled the objection and Powell continued to testify that Nichols yelled at Kay Lynn on the phone and used foul language.

¶15   The State contends the testimony about Nichols and Kay Lynn's relationship was relevant because Nichols may have dominated Kay Lynn to the point that he could force her to testify in his favor, and was necessary to demonstrate Kay Lynn's bias in theorizing that T.K. was simply reiterating her own story of molestation.

---

[1] Kay Lynn testified that she had been molested by a cousin as a young girl and had relayed the story to T.K. as a cautionary tale. She testified that she believed T.K.'s story was simply a retelling of her own, as some of the language and facts were similar.  The prosecution thus asked and was granted leave to treat her as an adverse witness.

### 3. Darren Reid and Brian Nauman

¶16    Darren Reid had been incarcerated with Nichols prior to trial and was called by the defense.    During the State's cross-examination, Reid was asked questions about telephone conversations he overheard between Nichols and Kay Lynn.  Specifically, Reid was asked whether he overheard Nichols asking Kay Lynn to bring sex toys when visiting him, referring to himself as "[Kay Lynn's] master," and discussing how he embellished letters to Kay Lynn with sexually explicit comments.  Nichols objected to this line of questioning, but the District Court overruled the objection.  The State concedes that Nichols' objection should have been sustained because the door to character evidence testimony had not yet been opened, but contends that the error was harmless because the testimony was not admitted to prove an element of the charges and was cumulative of evidence properly admitted elsewhere.

¶17    Brian Nauman was also an inmate with Nichols and testified on his behalf. During cross-examination, the State pursued a similar line of questioning, again asking about Nichols' sex toy requests, the references to being Kay Lynn's "master," and the sexually explicit messages written to Kay Lynn.  Additionally, the State asked Nauman if he had ever heard Nichols degrade women, to which Nauman answered in the negative. The State argues the testimony was proper because Nauman had referred to Nichols as a "good Christian" during his direct examination, thus opening the door to these questions.

¶18    Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than

10

it would be without the evidence." M. R. Evid. 401. Generally, all relevant evidence is admissible under M. R. Evid. 402. M. R. Evid. 403 provides that evidence, even if relevant, may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."

¶19 Throughout the course of Nichols' trial, the State succeeded in eliciting testimony about Nichols' private sexual habits. While defense counsel's opening remarks about Nichols' active sex life with Kay Lynn may have opened the door to some scrutiny about the truth of that statement, the State's questioning about the details of the couple's variant sexual practices was inflammatory and unfairly prejudicial. The District Court attempted to keep the questioning "within a certain range," but the State, given an inch, took a mile. While the intertwined questioning about Nichols' potential dominance over Kay Lynn may well have been relevant to establishing the motivation for, or bias in, Kay Lynn's testimony, or that Nichols was searching for other sexual partners, those points could have been explored without delving into the exacting details of the couple's sexual habits. We must conclude that the admission of this testimony was an abuse of discretion by the District Court.

¶20 The State argues the error was not reversible, and § 46-20-701(1), MCA, provides that a cause "may not be reversed by reason of any error committed by the trial court against the convicted person unless the record shows that the error was prejudicial." We held in *State v. Gray*, 207 Mont. 261, 268, 673 P.2d 1262, 1266 (1983), that an error requires reversal if a reasonable possibility exists that the inadmissible evidence might

11

have contributed to a conviction. In *State v. Van Kirk*, 2001 MT 184, ¶ 37, 306 Mont. 215, 32 P.3d 735, this Court adopted a two-step analysis to be used when determining whether an alleged error prejudiced a criminal defendant's right to a fair trial and is thus reversible.

¶21 First, error must be categorized as either "structural" or "trial" error. *Van Kirk*, ¶¶ 37, 43. "Structural error" is reversible without additional review and encompasses such problems as error in the jury selection process, total depravation of the right to counsel, and lack of an impartial trial judge. *Van Kirk*, ¶ 39. "Trial error" commonly occurs during the presentation of a case to a jury and is not presumptively prejudicial. *Van Kirk*, ¶ 40. Here, the improper admission of the testimony was trial error.

¶22 Next, it must be determined whether a reasonable possibility exists that the evidence might have contributed to the conviction. *Van Kirk*, ¶ 42. In making this determination, we utilize the "cumulative evidence" test, which asks whether the fact-finder was presented with admissible evidence proving the same facts as the tainted evidence. *Van Kirk*, ¶ 43. If the evidence at issue does not go to the proof of an element of the charged crime and there is no other admissible evidence tending to prove the particular fact at issue, the admission of the evidence will only be deemed harmless if the State demonstrates there was no reasonable possibility the admission contributed to the defendant's conviction. *Van Kirk*, ¶ 46. Such is the case here: the State must "demonstrate that, qualitatively, there was no reasonable possibility that the tainted evidence might have contributed to the defendant's conviction . . . ." *Van Kirk*, ¶ 46.

12

¶23    Given our conclusion that the tainted evidence was inflammatory in nature, this is a difficult burden for the State to carry. *Van Kirk*, ¶ 46. Further, the State's case was not overwhelmingly strong. Given the inconclusive physical examination, the key evidence was T.K.'s testimony and the challenged testimony of two witnesses who testified to hearing Nichols admit to the crime while incarcerated. We conclude that the tainted evidence about Nichols' sexual habits likely contributed to his conviction. Accordingly, we reverse.

¶24    *2. Did the District Court err by allowing a primary investigator to act as both a representative of the State and a witness during trial?*

¶25    While our reversal under the first issue obviates the need to address the other issues presented, we take this opportunity to address the second issue in order to provide guidance in this matter in the event of retrial, and to clarify our holding in a previous case. *See K & R P'ship v. City of Whitefish*, 2008 MT 228, ¶ 39, 334 Mont. 336, 189 P.3d 593 ("To provide guidance upon remand, we continue our review of the remaining issues on appeal."). M. R. Evid. 615 states:

> At the request of a party, the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize the exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney . . . .

¶26    We held in *Faulconbridge v. State*, 2006 MT 198, ¶ 53, 333 Mont. 186, 142 P.3d 777, that the language of Rule 615 permits a validly designated representative to remain in the courtroom during trial and testify. Here, the State cited *Faulconbridge* as precedent to utilize Detective Buls as both a designated representative of the State and a

13

witness. Detective Buls was allowed to remain in the courtroom even when other witnesses were excluded. Nichols argues that our holding in *Faulconbridge* is not applicable to criminal proceedings because it was a civil matter involving only money damages. The State disagrees, noting that *Faulconbridge* overruled two criminal cases in which the use of a law enforcement officer as a designated representative and witness had been prohibited. We agree. *Faulconbridge* explicitly overruled two prior criminal cases analogous to the case here. Our intention to apply the holding to both civil and criminal cases was clear.

¶27   Reversed.


/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ MICHAEL E WHEAT
/S/ JAMES JEREMIAH SHEA

14