FILED

September 15 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 13-0693

DA 13-0693

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 271

STATE OF MONTANA,

        Plaintiff and Appellee,

   v.

WALTER M. LARSON, JR.,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Seventh Judicial District,
In and For the County of Dawson, Cause No. DC 12-06
Honorable Richard A. Simonton, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Wade Zolynski, Chief Appellate Defender, Koan Mercer, Assistant
          Appellate Defender, Helena, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General, Micheal S. Wellenstein,
          Brant S. Light, Assistant Attorneys General, Helena, Montana

          Olivia Norlin-Rieger, Dawson County Attorney, Glendive, Montana

          Submitted on Briefs:  July 1, 2015
                   Decided:  September 15, 2015

Filed:

_____

             Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1    On April 5, 2015, a jury convicted Walter M. Larson (Larson) of deliberate homicide in the Seventh Judicial District Court, Dawson County. The victim was Larson's ex-wife, Susan Casey (Susie). Larson challenges the denial of his motion to suppress statements made while in police custody and asserts that police questioned Larson in violation of his right to counsel and right to remain silent. Larson also maintains that he was denied the effective assistance of trial counsel when counsel failed to present the video recording of his statement. We affirm.

¶2    We restate the issues on appeal as follows:

*1. Whether Larson's conviction must be reversed based upon the denial of his Motion to Suppress.*

*2. Whether Larson's defense counsel provided ineffective assistance by failing to present the video recording of the police interview at the suppression hearing.*

### FACTUAL AND PROCEDURAL BACKGROUND

¶3    In the spring of 2008, Susie's body was found floating in the Yellowstone River near Fallon several weeks after her family had reported her missing. When discovered, Susie was wearing a shirt, no bra, a right shoe, and pants. An autopsy performed by Dr. Thomas Bennett determined the cause of death was consistent with strangulation and that Susie had died before she was placed in the water.

¶4    Larson and Susie were married in 1993, the year their daughter was born. Two years later they had a son. Susie filed for divorce in 1997, which became final in February 1998. Larson did not want the divorce and did not have contact with his children for a number of years after the marriage ended.

2

¶5      In August 1998, Susie married Ted Casey (Ted) with whom she eventually had two daughters. A few months later, Larson entered onto the Caseys' property twice. He peeked into windows, pulled wires on one of their vehicles, took Susie's purse, and her credit cards, house key, and other personal effects. The second time Larson entered the Caseys' property he carried an unloaded shotgun with him. During both incidents, Larson wore gloves. Larson was arrested and pled guilty to criminal trespass, criminal mischief, and stalking. Larson said he had been "hurt" and was "lashing out" at the Caseys.

¶6      In November 2007, Susie and Ted separated. Susie moved with her children into the Ponderosa Apartments in Glendive. That same year, Susie began allowing Larson to see his children. Susie and Larson had daily conversations and Larson believed that they might renew their relationship and possibly their marriage. Larson stated that he and Susie had discussed the possibility of Larson transferring to a job in Rapid City and Susie and the children moving to Rapid City. However, this plan was on hold while Susie moved forward with her divorce from Ted.

¶7      In the spring of 2008, Susie began to date Brad Holzer (Brad). Brad was still married to his wife, but their relationship had ended and they were both seeing other people. When Larson learned of Susie's interest in Brad, he was hurt and confused. On April 4, 2008, Larson talked to Susie about Brad. According to Larson, Susie told him that she had ended her relationship with Brad and that she and Larson were going to continue to work on their relationship. Despite this reassurance from Susie, Larson continued to exhibit stalking behaviors towards Susie and the men in Susie's life. For

example, on April 5, 2008, Brad's wife received an anonymous call. The caller asked to leave a message for Brad and said: "Tell him to stop messing around with married women" and "Ask him about Susan Casey." Larson later admitted that he was the one who had called Brad's wife and that he had wanted to make trouble for Brad. Larson claimed he told Susie about the call, and that she told him not to do it again.

¶8 Six days later, on April 11, 2008, Brad received an email from someone identified as "Denise Johnson," which stated "How's your girlfriend? How does your wife feel about it?" Brad did not know a Denise Johnson and had no idea who might have sent the email. Brad forwarded the email to Susie and talked to her about it. Brad then received another email from Johnson that day, which said "Just like every other guy's she's screwing a spineless little prik not man enuff 2 tell her husband." Johnson's email address was "jdenise66@yahoo.com." A 2012 examination of Larson's computer recovered email information from an account named jdenise66@yahoo.com. When confronted at trial, Larson admitted that he created the address so he could send emails to Brad and admitted to sending the April 11, 2008 emails.

¶9 Larson's stalking behavior continued. On the evening of April 11, 2008, Ted received a call, and the male caller said "Brad Holzer's been screwing your wife." Ted did not know the caller. Ted called Susie, asked if she knew Brad Holzer and told her about the call. Although Susie initially denied knowing Brad, she subsequently admitted to Ted that she did know Brad. Again, after being confronted at trial, Larson admitted that he was the one who had called Ted.

4

¶10 Larson's suspicions about Susie's relationship with Brad appeared to be correct. Following a visit on April 11, 2008, with her friend, Linda Gay, Susie left Linda's house between 9 and 9:30 p.m., to meet Brad. Brad picked Susie up in front of her apartment in his Dodge pickup. They drove out to the "Intake," a slough area by Yellowstone River, arriving around 11:30 p.m., and parked. They drank beer and engaged in sexual activity. Afterward, Susie did not put her bra back on. Brad estimated that they left the Intake for Glendive around 4:30 or 5 a.m., on April 12, 2008.

¶11 When they arrived back at Susie's apartment, Brad parked his truck across the street. Brad testified that they arrived around 5 or 5:30 a.m. Susie's Trailblazer was parked in front of the apartment building doorway. It was dark outside and Brad did not see anyone on the street or in the vicinity of the Ponderosa Apartments. While parked across the street from the Ponderosa Apartments, Brad and Susie made out for about 25 minutes. Susie left Brad's truck carrying her leather coat, purse and bra, and walked across the street to the Ponderosa Apartments. Brad did not wait to see Susie go inside of the apartment building. This was the last time Susie was ever seen.

¶12 When Susie's children woke up Saturday morning, April 12, 2008, they discovered Susie was not home. Susie's children, Linda, Brad, and Ted all left messages on Susie's cell phone, but were unable to reach her. That morning Ted had dropped his daughters off at his brother's house at 5:45 a.m., and then went to city hall to sand floors. Ted arrived at city hall at 5:50 a.m. and was confirmed to have worked side-by-side with another worker until 9:15 a.m.

¶13 Billings Police interviewed Larson at 7:10 p.m., on Saturday, April 12, 2008. The interview was videotaped. Larson told the officers he last saw Susie at her Glendive apartment on Thursday, April 10, 2008. Larson stated that he talked to Susie three times on the telephone on Friday, April 11, 2008, with the last call occurring around 9:45 or 10 p.m. According to Larson, in the last call, Susie told him that she was going to visit with her friend Linda Gay for a little while and would give him a call later. Larson stated that he awoke at approximately 12:15 to 12:30 a.m., on April 12, 2008, and sent Susie a text asking if she was okay. Larson said he was concerned about Susie because she had a tendency to drink too much. After receiving no response, Larson called Susie, but she did not answer. Larson texted his son, asking him to have Susie get ahold of him, but Larson heard nothing back from his son.

¶14 At approximately 1:30 a.m., Larson said he decided to drive to Glendive to check on Susie's welfare. Before driving his silver minivan to Glendive, Larson purchased gas at a convenience store in Lockwood. Larson told the officers that on the drive to Glendive he called Susie and left messages asking her to contact him. Larson said he arrived in Glendive between 4:30 and 4:45 a.m., on April 12, 2008, and drove to Susie's apartment where he saw her vehicle. Larson claimed that he went inside the apartment building, up to Susie's apartment and knocked "softly," hoping that it would wake up Susie and not the children. After receiving no response, he "went out and called and texted a few times." When he received no response to his calls and texts, Larson said that he went back to Susie's door and knocked again and still got no response. Larson then stated: "So I went and parked and called and texted a few times." Larson parked around

the corner from Susie's apartment building. Larson said that the last time he tried to call Susie was approximately 5:30 or 5:45 a.m., as he was leaving Glendive.

¶15 The front door of Susie's apartment opens into the living room. At the time Larson claimed he was knocking on the apartment door, Larson's son was sleeping on the living room couch. His son said he did not hear anyone knock or any noises. Larson stated he was around Susie's apartment from 4:30 or 4:45 a.m., to probably 5:15 or 5:20 a.m., either at the door or parked around the corner. Larson claimed he never saw Susie returning home that morning and professed that he would never hurt Susie, because he loved her and always has loved her. He claimed he had nothing to do with her disappearance. When asked by police why he would drive all the way to Glendive at 1:30 a.m. to check on Susie's welfare and then not stay in Glendive, Larson responded that he assumed she was at home and passed out. When asked why he did not call the police to have the police check on Susie's wellbeing, if he was so concerned about her, Larson said that it never occurred to him.

¶16 Larson maintained that when he went to Glendive he was wearing jeans, a white t-shirt, a Nike hooded sweatshirt and white New Balance tennis shoes. The Glendive Police reviewed a surveillance video from the convenience store in Lockwood. In the video, Larson is not wearing a Nike hooded sweatshirt and white tennis shoes that Larson claimed he had been wearing. Upon being confronted at trial with this information, he admitted that the clothes he was wearing were not the clothes he gave to law enforcement.

¶17    Larson told the officers that he ran over a dead deer on his way to Glendive. He stated that after he returned to Billings he took a shower, changed his clothes and took his minivan to Don's Car Wash to wash off the deer remnants and bugs. When specifically asked what part of the van he had washed, Larson stated "I drove through Don's." At trial, however, Larson claimed he went to a self-service car wash prior to going to Don's Car Wash. At the self-service car wash, Larson testified he sprayed the van's rear cargo area with water to clean up a spilled soda and then vacuumed. Larson admitted he never told the officers that he had scrubbed the van's cargo area.

¶18    When the officers searched Larson's minivan they noticed its interior was recently scrubbed clean. The van's carpet in the rear cargo area was still wet and looked as if it had been brushed with a brush or a vacuum. The pad underneath the rear cargo area carpet was saturated with water and the recess areas had standing water. The officers found two hairs in the cargo area. A forensic scientist compared Susie's head hair to the hair found and determined that Susie's hair was similar enough that she could not be excluded as the source of the hair.

¶19    Larson had told the officers that he knew about Susie's relationship with Brad, and that Susie had told him she had ended it. Larson said that it "hurt" more than angered him when Larson found out about Susie's relationship with Brad. When the officers told Larson that Susie had been with Brad the previous night, Larson responded, "I didn't know that. What I was told is that she had ended that." The officers specifically asked him if he had any kind of contact with Brad and if he had sent him any emails. Larson said that he had no contact with Brad and that he had not sent any emails. After the State

introduced evidence at trial that Larson's computer was used to send Brad emails, Larson admitted to sending the April 11, 2008 emails to Brad.

¶20   As Brad had dropped Susie at her apartment during the same time frame Larson stated that he was in the vicinity of the apartment, the officers questioned Larson about his claim of not seeing Brad and Susie at Susie's apartment.  Larson was adamant about not seeing Susie, surmising that he likely was parked around the corner from Susie's apartment and unable to see the front of the apartment building.  Larson said he was in Glendive roughly from 4:30 to 6 a.m.  Larson claimed that the time of him "going up and knocking" on Susie's door was probably all done before 5:15 a.m.

¶21   U.S. Bank, which is located on the same block and on the same side of the street as the Ponderosa Apartments, has a surveillance camera by its ATM machine.  At 4:26 a.m., on April 12, 2008, the bank video captured a light colored minivan driving by the bank.  Larson stated he was driving his silver minivan and that he had arrived in Glendive at approximately 4:30 to 4:45 a.m.  At 4:52 a.m., the bank video shows a Dodge pickup parking across the street from the Ponderosa Apartments.  Brad testified that when he and Susie returned to Glendive he parked his Dodge pickup across the street from the Ponderosa Apartments and that they remained there for 20 to 25 minutes.  Susie then got out of the truck and walked across the street to her apartment building.  The bank video supports Brad's testimony showing the truck's cab dome light coming on and off at 5:19:31 a.m. and a door opening.  The truck then backs up from its parking spot and leaves the area at 5:19:46 a.m.

9

¶22 The bank video also depicts a person walking by the bank from the direction of Susie's apartment at 5:38 a.m., and that person appears to be carrying something. At 5:39 a.m., the video shows a light colored minivan, similar to the minivan that appeared at 4:26 a.m., drive by the bank and towards Susie's apartment building and, consistent with Larson's testimony that he left the area at approximately 5:45 a.m., the light colored minivan is seen driving past the bank in the opposite direction at 5:47 a.m.

¶23 Law enforcement found drag marks from the front of the apartment building going through the alley alongside the building, appearing to indicate Susie's body had been dragged from where she was strangled to a vehicle for removal.

¶24 For reasons not apparent from the record, the State did not bring charges until four years after Susie's death. In February 2012, the State charged Larson with deliberate homicide and tampering with evidence. Two Glendive officers traveled to Arizona, where Larson had moved in the fall of 2008, arrested Larson, and questioned him. At the beginning of the interview, the following occurred:

> Chief Ty Ulrich (TU): And I guess we'd like to sit down and talk with you about that a little bit today, if that'd be fine. You okay with that?
> ML (Walter Martin Larson): Yeah, you can . . .
> TU: Okay.
> ML: I'm not going to answer any questions but . . .
> TU: You don't want to answer any questions at all?
> ML: Have you contacted Chris Copenhaver?
> TU: Who's Chris Copenhaver?
> ML: She was my attorney.
> TU: Okay. How about if I go through the Miranda form and at least advise you of your rights? . . .

Larson later explains that he last spoke to his attorney two years ago. Chief Ulrich proceeds to advise Larson of his Miranda rights and thereafter, on several occasions, asks

10

Larson to waive his Miranda rights. Larson refuses. The interview nevertheless continues, in relevant part:

> TU: And you're not interested in talking at all, as far as what brought us down here; what information.
> ML: Nope. I pretty much knew when I was targeted years ago that something like this could happen at any time.
> Glendive Police Officer Wally Peter (WP): But you say targeted, Marty, but, no, you were never targeted. Um, the thing is, though, is if you have information that says that you didn't do something, we want to hear that.
> ML: The only thing I have is what I've said. And that means nothing to any of you.
> WP: It most certainly does.
> ML: No it doesn't.
> WP: It means a lot to us.
> ML: There were policeman at my door years ago, within, I don't know, 12; 15; 16 hours of when she was last seen or went missing or whatever it was. That sounds pretty much like I was targeted.
> TU: We, we–during that time, we interviewed quite a few people that were around Susie at that time. In fact . . .
> ML: But I, I knew this day could come, so it is what it is.
> TU: So you've been waiting the whole time for somebody to show up?
> ML: I knew it could happen.
> TU: You're not . . .
> ML: Until something happened that ended whatever it is with her, this day could happen. Could have been 50 years; could have been 50 minutes, but this day could happen. Just how it is.

¶25 Despite Larson's refusal to sign a waiver of his Miranda rights, law enforcement continued to question him. Larson made statements such as "The only thing I have to say is I have no idea what happened to her. I don't know how she passed away. That's it." Larson stated: "You can do the Miranda and that's all you're gonna get." Conversely, Larson continues to respond to their questions and states on several occasions that he does not need the assistance of counsel. Larson's responses describe his and Susie's

11

plans for the future, Susie's deceptions regarding her other romantic relationships, and his feelings about Susie.

¶26 Larson filed a motion to suppress arguing that the interview violated his right to counsel.[1] The District Court held an evidentiary hearing on August 23, 2012, where it received a transcript of the Arizona interview into evidence. Neither party presented the court with the video recording of the interview nor contested the transcript's accuracy. On appeal, Larson contends, and the State does not dispute, that a portion of the interview was incorrectly transcribed, omitting Larson's clearest invocation of his right to counsel. Larson maintains the actual exchange recorded by the video provides:

Officer: So at this point, you're–you do not want to talk until–
Larson: *Correct.* [Portion omitted.]
Officer: you have a chance to speak with [counsel]? Is that what I'm . . .
Larson: I probably won't speak even after I speak to her.

¶27 The District Court denied Larson's Motion to Suppress concluding that Larson had not unambiguously invoked either his right to counsel or his right to remain silent. Following the District Court's order, the video tape was admitted by the State at trial. The jury found Larson guilty of deliberate homicide and tampering with evidence. Larson was sentenced for the deliberate homicide to Montana State Prison for 100 years. He received a consecutive 10 year sentence on his conviction for tampering.

**STANDARD OF REVIEW**

¶28 We review a district court's ruling on a motion to suppress to determine whether its findings of fact are clearly erroneous and whether the court correctly interpreted and

---

[1] While the District Court found that there was no violation of Larson's right to remain silent, Larson had only alleged in the trial court a violation of his right to counsel.

applied the law to those facts. *State v. Dupree*, 2015 MT 103, ¶ 8, 378 Mont. 499, 346 P.3d 1114. Claims of ineffective assistance of counsel are mixed questions of law and fact which we review de novo. *State v. Kougl*, 2004 MT 243, ¶ 12, 323 Mont. 6, 97 P.3d 1095.

**DISCUSSION**

¶29 *1. Whether Larson's conviction must be reversed based upon the denial of his Motion to Suppress.*

¶30 Larson contends that after being given a Miranda warning and being informed of his rights to counsel and to remain silent, that he unequivocally invoked these rights during the February 2012 interview with police. Larson believes the District Court erred in denying his motion to suppress the resulting statements and claims that these statements were exploited by the State during trial. More specifically, Larson maintains that in both its opening and closing statements, the State quoted Larson's "I knew this day could come" response to imply his consciousness of guilt. Further, Larson argues that the State used Larson's own words during the interview to convince the jury that Larson was reliving his murderous confrontation with Susie during the 2012 interrogation. Correspondingly, the State argues that Larson did not unequivocally and unambiguously invoke his right to counsel and that we should not address the right to remain silent because Larson did not raise it in his Motion to Suppress.

¶31 The interview may be described as follows. At the outset, Larson was advised of his Miranda rights. Larson looked at the Acknowledgment of Rights form and audibly read it. Larson had previously been represented by Kris Copenhaver, a lawyer in

13

Billings, but Larson had not spoken to her for approximately two years. At times, Larson indicated that he did not need an attorney and that law enforcement could ask him questions, unless there was something that he was not comfortable with. At other times, Larson indicated that Copenhaver *was* his attorney, but that he would probably not speak with police even if he were to speak with Copenhaver. Although Larson said he would not answer any questions, he continued to do so and never told police to stop. The parties do not dispute that Larson understood his rights. The District Court specifically found that Larson understood his rights and that he understood he could stop answering questions at any time.

¶32 We do not find it necessary to wade into the murky waters of this interview and determine whether Larson invoked his right to counsel or right to remain silent. We observe that even if we were to assume that police interrogated Larson after he invoked his right to counsel or right to remain silent, and that the trial court erred in concluding otherwise, Larson admitted nothing during the interview. Larson's interview contains no inculpatory or prejudicial statements and provides very little information regarding the events surrounding Susie's death. Therefore, assuming error, we proceed to evaluate whether the error "prejudiced [Larson's] right to a fair trial and is therefore reversible."[2] *State v. Van Kirk*, 2001 MT 184, ¶¶ 36-37, 306 Mont. 215, 32 P.3d 735.

¶33 Section 46-20-701(1), MCA, provides "a cause may not be reversed by reason of any error committed by the trial court against the convicted person unless the record

---

[2] Larson correctly notes that the admission of the 2012 interrogation, assuming error, is trial error. Larson does not allege structural error.

shows that the error was prejudicial." Once a defendant demonstrates trial error and alleges prejudice, "the State must demonstrate that there is no reasonable possibility that the inadmissible evidence might have contributed to the conviction." *Van Kirk*, ¶¶ 42, 47. In evaluating the evidence, the Court applies the cumulative evidence test to determine whether admission or exclusion of the evidence was harmless. The cumulative evidence test asks whether the fact finder was presented with admissible evidence providing the same facts as the tainted evidence. *State v. Nichols*, 2014 MT 343, ¶ 22, 377 Mont. 384, 339 P.3d 1274, *Van Kirk*, ¶ 43. If the tainted evidence does not go to the proof of an element of the charged crime, and there is no other admissible evidence tending to prove the particular fact at issue, the admission of the evidence will only be deemed harmless if the State demonstrates there was no reasonable possibility the admission contributed to the defendant's conviction. *Nichols*, ¶ 22.

¶34 Larson argues that the State's reference in its opening and closing statements, "I knew this day would come," implies that Larson knew he was guilty. However, when asked at trial what he meant by the statement, Larson gave another possible inference to be taken from those words:

> I knew from April 12th [2008] when the police showed up at my door and the way I was treated in that interview that unless somebody had come forward and said they had done something to Susie or some other resolution came, that at any time they could come and arrest me.

¶35 The inference of a guilty conscience implied by the State by reciting this portion of the interrogation is weak, at best. Many plausible inferences can be drawn from Larson's words "I knew this day would come." It is not a confession, nor is it an

15

incriminating statement. The statement merely reflects that Larson believed that the police at any time could show up and arrest him because he had been unfairly targeted, since Susie's disappearance, as a suspect in his ex-wife's death. Larson maintained that police had targeted him as a suspect in the beginning of their investigation, to the exclusion of everyone else. His statement in the 2012 interview supports his defense theory.

¶36 Nevertheless, even if we assume that Larson's words created an inference of guilt, there was ample evidence proving Larson's guilt. The jury considered that Larson was at Susie's apartment when Brad dropped her off, which was the last time Susie was seen. Larson had scrubbed the inside of the rear of his van right after Susie's disappearance, leaving it water-soaked. A hair was found in the cargo area of Larson's vehicle which DNA testing confirmed could not exclude Susie as the source. Evidence indicated stalking behavior by Larson through his use of a false email address to send messages to Susie's new boyfriend, Brad, and Larson's anonymous calls to Susie's husband, Ted, and to Brad's wife. Larson was not truthful about the clothing he had worn when he drove to Susie's and lied to police about not contacting or emailing Brad. Evidence also indicated that Larson drove three hours in the early morning in order to check on Susie's welfare, but then turned around and drove back without seeing her. Many of Larson's explanations for his behavior were simply unbelievable and not credible.

¶37 Larson's single statement that "I knew this day would come" cannot be construed as an admission of guilt. His 2012 interrogation contains no confession or anything that is inculpatory or prejudicial. He provides little information surrounding the events of the

16

homicide and told officers that his relationship with Susie was his business. Further, upon review of the interview, we fail to see how it supports Larson's contention that the State used it to convince the jury Larson was reliving his murderous confrontation with Susie. Under these facts, we conclude that there was no reasonable possibility that admission of the 2012 interview contributed to Larson's conviction.

¶38    *2. Whether Larson's defense counsel provided ineffective assistance by failing to present the video recording of the police interview at the suppression hearing.*

¶39    The Sixth Amendment of the U.S. Constitution and Article II, Section 24 of the Montana Constitution guarantee defendants the right to effective assistance of counsel in criminal cases. Montana courts analyze such claims using a two-pronged test as set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, (1984). *Kougl*, ¶ 11. To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate his counsel's performance was deficient or fell below an objective standard of reasonableness and establish prejudice by demonstrating a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Kougl*, ¶ 11. We need not address both prongs of the test if a petitioner fails to establish either prong. *State v. Williams*, 2015 MT 247, ¶ 20, 380 Mont. 445, ___ P.3d __.

¶40    Here, Larson argues that there was no plausible justification for his counsel's failure to present the district Court with the recording of the interview and for allowing the District Court to decide the suppression motion based upon a transcript that Larson claims omits his clearest invocation of his right to counsel. Larson alleges this failure was prejudicial because it would have conclusively rebutted any argument that his

17

requests for counsel were ambiguous and would have mandated suppression of his 2012 interview statements. Alternatively, Larson argues, there is a reasonable probability his counsel's failure to correct the transcript's omission affected the District Court's suppression ruling.

¶41 Having already determined that there is no reasonable probability the results of Larson's trial would have been different had the 2012 interview been held inadmissible, we need not address whether trial counsel's performance was deficient in failing to request that the trial court review the video recording of the interview. Larson is unable to establish the prejudice prong and his ineffective assistance of counsel claim must, therefore, fail. *State v. Hagen*, 2002 MT, ¶ 19, 311 Mont. 117, 53 P.3d 885.

## CONCLUSION

¶42 While we have avoided wading into the murky waters of this particular interview to ascertain whether Larson unequivocally invoked his right to counsel or his right to remain silent, we do so only because the interview clearly did not produce any incriminating information. There is no reasonable possibility that admission of the 2012 interview contributed to Larson's conviction. Accordingly, Larson's convictions are affirmed.

/S/ LAURIE McKINNON

We concur:

/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ JIM RICE